Good morning, Your Honor. May it please the Court. Nathan Zaslom, excuse me, Nathan Zaslom on behalf of the petitioner, Jonas Noguera. In this case, the D.I.A. made a determination in the first instance that Mr. Noguera falsely testified under oath before the asylum officer in order to gain a benefit under the Immigration Act, the I.N.A. I say that the Board made this decision in the first instance because it did not affirm the reasoning of the I.J. At the immigration trial level, the I.J. actually reasoned that Mr. Noguera was permanently ineligible for relief under the I.N.A. due to the frivolous application bar. However, the Board correctly reversed the I.J. on this aspect of his decision, as the application for asylum was clearly filed prior to the 1997 date. However, the Board issued a decision on a legal issue which was never decided by the immigration judge, namely whether the statutory bar to good moral character was triggered in respect to the cancellation application due to false testimony under a false testimony before the asylum officer for the benefit, for the purpose of getting an immigration benefit. Now, the I.J. never the I.J. and the B.A.A. never explained how the petitioner could be under oath before the asylum officer when he did not read or write English when he signed the English language oath form. In my view, this case boils down to two issues. Number one was the petitioner under oath after he signed an oath form in English which he did not understand and when there's no interpreter. And number two, if he was under oath and it did constitute testimony, is the B.A.A. required to identify the benefit under the I.N.A. that it believes the petitioner intended to gain? Now, taking the first issue, this factual scenario is somewhat unusual because there was no ---- Robertson, on that first issue, I'm confused about something. And I don't know if you have the administrative record before you, but I know it's page 140. I don't have the actual page in front of me. But there's a reference to a ---- an oath form in Spanish. And it's ---- it says it's page 25 of, I guess, the attached exhibits. Do you see what I'm talking about? Kagan. Okay. My question is just are you aware of any oath form that actually was provided to him in Spanish? Because the only one I've seen is they're both in English. But that document refers to one in Spanish. So I just ---- Right. Yeah. That page 25 is 165 of the administrative record. And what I believe is that was probably a document prepared, a table of contents prepared. It was probably mistakenly identified that way because he wrote in Espanol. This is in English. Yeah. But the form, the form is ---- I have copies of both forms. They're in English. They're both in English. Right. Right. Yeah. So why is that talking about there being this oath form in Spanish? Maybe I'll have to ask the government that. Yeah. But you're not aware of any? Right. Yeah. I'm not aware of any. And I think he testified he did not sign one in Spanish. I'm just speculating that when the table of contents was prepared by the government trial attorney, they saw the Spanish word Espanol there and maybe thought, oh, this was a Spanish form. Okay. But that's on the 2005 one, right? Right. The 2006 one, it says English. Right. Well, the 2006 one, yeah, I have that at page 1 ---- oh, sorry. Yeah, page ---- is that 163 of the administrative record? Yeah. That's right. Okay. Right. That ---- so this one was done in 2006, you know, maybe within a year of the 2005 one. Now, within that time period, he obviously didn't read when to learn. What precisely is your argument about these oath forms? Okay. Sure, Your Honor. Well, so what I was getting to is normally when someone takes an oath, they would swear to be under oath and then start giving testimony under oath. Or if it's an affidavit, they would sign, this is under oath, and then their writing would follow. And either way, it would be if their statements were said in a certain language, that would be reflected on the manner in which they were taken under oath. So, for example, if someone doesn't understand the written English language and they're put under oath in the written form, then they give oral statements which they understand most of or some of. Then even though some of those oral statements, you know, were not true, he can't be deemed to be under oath, in my opinion, because he did not understand the form. All right. Well, I mean, I'm ---- let me understand your client's testimony. He says that he was provided with this form, but he was totally unable to read what was on here, and nobody explained to him what the thing said? Right. And I think that's on page 113 and 116 of the record. Do you remember being asked to sign a document regarding your oath to tell the truth in the interview on May 30th? Answer, yes, I do. I did sign it. Did you know what you were signing? Answer, no, I did not know what it said because I don't know how to read in English, and they just simply gave me the document and asked me to sign it. Okay. But the form says the language used by individual. It says English. That's the second time, the 2006 time. Initially, he put Spanish both in the language used by the individual, even though he testified in English, and in the ---- I'm referring to 2005, and on the interpreter's part, he put Spanish. Forget about 2005. I'm with you on 2005. I'm focused on 2006 because it says, language used by individual, English. And then we have this testimony from your client that completely contradicts that. Right. No. The language used by individual refers to the statements that he's going to give to the asylum officer. Okay. The interview with the asylum officer is conducted in the English language. Okay. So ---- Well, but so he signed, I mean, right above his signature, it says, I do solemnly swear, slash, affirm to tell the full truth during my interview. He signs it. He didn't ---- he doesn't understand the written English, and that's his testimony. So let me get to another point. Well, first of all, when he wrote English, you can see, first, he crossed out something which is supposed to be writing English, but he clearly didn't know how to spell it. And my other point is, if you look at the 2005 form in conjunction with the 2006 form, if he clearly doesn't understand this form, and he's writing Español and Spanish, obviously, in two places where he's ---- it's not like within a year he has under ---- he's learned English, and now he can read English. My only point is this corroborates his testimony that he didn't know what he was signing. And I gather that nobody ever found his testimony not credible on this point? Right. And that's an important point, because the case law of this Court is very clear that if an immigration judge never makes an adverse credibility finding, the testimony is deemed credible. The trial attorney never challenged that on appeal. The board never disturbed that. So in the universe of facts in this case, his testimony is deemed credible. Okay. So then why ---- again, maybe this is a question for the government, but I want to ask you. Okay. The EIA specifically says Petitioner did not dispute he was under oath. I think they took a ---- they made an assumption that he didn't dispute that he made false statements to the asylum officer. Although in the record, and I argued this at the trial court level, I argued this to the judge that he didn't understand this form, but this wasn't the issue the judge ---- that's why I started off saying this wasn't the issue, because it wasn't the issue, you know, exactly litigated until the board used it as an alternate grounds to deny. And my argument now is they kind of jumped the gun and got to the point where if you say something false to the asylum officer, it's under oath, but there's this discrepancy where he said that form. And so was this particular point, you know, your client's testimony that he didn't understand the written form, was this briefed before the BIA? Yeah. I did brief this to the BIA, and that was in conjunction with the argument that he didn't understand the frivolous warnings, the frivolous application bar warnings. The BIA accepted just the fact that the application was filed in 93 alone, so they didn't even get there. But in the context of what was on appeal, I did argue that, but that wasn't even an issue that was appealed. And I guess I'm ---- We have 50 seconds left. Do you want to serve it? Yeah. Maybe I'll save some rebuttal time. Thank you. Morning, Your Honors. Joseph O'Connell on behalf of the Respondent, the Attorney General, Eric Holder. Your Honors, in this case, the Board properly denied Mr. Noguera's cancellation application because he provided false testimony for the purpose of obtaining benefits under the INA. Mr. Noguera filed an asylum application in 1993 claiming to be from Guatemala. Then he testified under oath twice. Well, hang on. Sure. That's obviously the main issue. So is there a oath form that he signs in Spanish, yes or no? There is no Spanish form. Okay. So there's the 2005 form, and the interview was conducted in Spanish, and presumably the asylum officer spoke Spanish to Mr. Noguera, and the asylum officer administers oaths, and he signed the form. We don't have the asylum officer's testimony in this case. We just have the form. Okay. Well, we have his testimony saying, I did not understand. They gave me this form. I signed it. I had no idea what the thing said, which was that testimony was not found credible. It wasn't found credible, but there's countervailing evidence in the record in this case. Okay. Now, there's two forms of countervailing evidence. You need a finding that he testified under oath. And doesn't that mean that he has to understand that he was under oath? I do believe that that's correct, but the board held that he did understand that he was under oath. The immigration judge said in his decision that he was under oath. Now, wait. The immigration judge, what did the immigration judge find about whether he knew he was under oath? Yes. The immigration judge said in his decision Mr. Noguera testified under oath before the asylum officer. Now, he didn't make that finding. No, no. That's not the answer to my question. Okay. My question, everybody agrees that he testified under oath, that he signed an oath. Yes, Your Honor. The question is, did the immigration judge find that he knowingly knew what he was signing, knew that it was an oath, and what the meaning of the oath is? We – the immigration judge did not get into the weeds of whether or not he knew it or not. No, he didn't make any finding. He didn't make any finding in that regard.  Now, you say the BIA did. Yes, Your Honor. But the BIA can't make a factual finding, can it? The board relied on the immigration judge's finding. But the BIA didn't make the finding you just said. Yes, but the board – The board made the finding. The board applied law to undisputed facts. Now, I don't think the board actually made a factual finding. But there is no undisputed fact about whether he understood the oath. We have a companion – not a companion case, but a case that was submitted under briefs where there's a rule that says, hey, if you didn't get the notice because somebody in your house didn't deliver it, that doesn't matter. The problem's in your house. It's considered delivered when it's delivered to the house, even if you didn't get it. We don't have a rule that says if you testified falsely and you signed an oath, you testified knowingly under oath, you understood the oath, and you testified falsely. There's a missing – back to the link again. The link is – The missing gap. Yeah. I heard the other case. That's right. So that seems to me as we were missing that little, maybe a bridge that we can argue, oh, my God, of course he understood. He's before – he's gone through this before. He knows the significance of it. But we're inferring something that was not found. It's – I would argue that based on the board's decision that that missing link is implicit in the board's decision that he – of course, the board would never find that, you know, USC 1101 F6 would apply to him if he didn't knowing – if he wasn't knowingly under oath. You know, that's all absolutely true. It's the problem of the rules. You know, sometimes the government likes procedures, sometimes it doesn't like procedures. But this is one procedure that applies in immigration, that the BIA can't supply a missing finding. Findings must be made by the IJ. And the board can't say, well, of course the IJ must have thought this. We've got to remand it to the IJ, who can then make the missing finding. But we can't make a finding or draw an inference, and the board can't do it unless there's a finding by the IJ. And it does seem to me – and this is not a vote, but I mean, I just think there's a problem here. We can all probably guess that the person's lying. I mean, let's say we do. But the question of whether he understood what an oath was. Well, I believe that there's evidence in the record to support that, though. But there has to be a finding. We can't make a finding. That's – I understand that, Your Honor, but I think the government would argue that the immigration judge's statement in his decision saying, this guy lied under oath, I think it's implicit saying, yes, he knew what he was doing when he was under oath and when he was lying. And even in his testimony, there's a part – at 110 in the record, Mr. Noguera says, you know, I told the asylum officer it was the truth, but I knew it wasn't the truth. I mean, I would argue that's more than sufficient. Kennedy, but if he told the asylum officer it was the truth, and he knew it wasn't, that's not enough. It's got to be – he's got to know what an oath is. You know, there are cases here where it says somebody just lies. That's not, you know, not logical. I would take that evidence that I just used with the testimony, and I would combine it. Kennedy, and you would have made a great finding if you had been the I.J. I would combine that with the document in 2006, that he conducted the interview in English, and he signed the English document. That was an oath. A declaration. The problem from your standpoint is that you have this testimony that in order to support the finding you'd like us to make, you'd have to say that he was not credible when he denied understanding that 2006 form, and we don't have that. I don't think the credibility is an issue here, because the agency can make a certain finding, and they don't have to necessarily credit testimony in the face of countervailing evidence, including the evidence that he's told the asylum officer, like, I told him it was the truth, but I knew it wasn't the truth, and in light of the fact that he signed that 2006 document, and he conducted the whole interview in English. The problem is that the asylum officer was thinking about making a finding he thought he needed for a different legal conclusion. And that's why he decided this case on a basis different from what the BIA did. And that's why he was thinking of what he needed to support that kind of a finding. And so he, you know, you're saying anything's there that would have permitted him to make the finding we need, but he didn't think it was necessary to make that finding. I still don't think it's necessary, because I think it was implicit in that finding that the statement the immigration judge made that said this Mr. Noguera lied under oath to the asylum officer twice. Well, let's just take an example, that somebody lies under oath. An asylum officer says, do you speak Spanish? He says, no. He says, okay, I'm going to read you this oath under Spanish. He says, now say something. Well, he would have lied under oath. He would have said, but he wouldn't have known what the oath meant and what it was, because he was told in the language he didn't understand. Now, that's not this case I understand. But I'm saying lying under oath is not the end. He's got to have an understanding of the meaning of the oath. Well, in this case, you know, Mr. Noguera never told anybody that he didn't understand English. And Mr. Noguera's omission in this case shouldn't be held against the agency in making its finding. Okay. Well, thank you. I think we've explored this issue. Thanks, counsel. If there's any more questions, I'll let Counselor Gluck. You have 50-something seconds if you want to. If you would like to snatch defeat from the jaws of victory, go right ahead. Okay. I'll submit, then. Thank you, counsel. Case in Jordan will be submitted.
judges: Lasnik, Reinhardt, Watford